**Walter G. JENNISON**

v.

**Eugene S. BIERER.**

**Civ. A. No. 81–139.**

United States District Court,
D. Vermont.

Dec. 7, 1984.

Thomas W. Costello, Brattleboro, Vt., for plaintiff.

L. Raymond Massucco, Kissell & Massucco, Bellows Falls, Vt., for defendant.

## FINDINGS AND CONCLUSIONS

HOLDEN, Senior District Judge.

The court's diversity jurisdiction under 28 U.S.C. § 1332 has been invoked by the plaintiff Walter G. Jennison, a citizen of Vermont, against Eugene S. Bierer of the State of New Hampshire. The action seeks equitable relief to enforce an accounting between the parties who were formerly equal partners in a real estate investment project designated as the J & B Company. The partners were also business associates and stockholders in the Thomas Turner Company, Inc., formerly a furniture manufacturing enterprise with its principal operation in the Village of Bellows Falls, Vermont, which was also the site of the partnership investment of J & B.

## THE FACTS

The roots of the controversy are imbedded in the Turner Company. In the beginning the Turner Company was entirely owned by Thomas Turner and his wife Constance. The company was engaged in the woodworking industry and operated with six employees. The plaintiff initially joined that work force as a floor sweeper. The company apparently prospered and, as the number of employees grew, Jennison became superintendent in full charge of production in 1962. In 1965 Turner offered the plaintiff an opportunity to purchase 25 shares in the company's stock, which constituted Jennison as the owner of 25% of the total common stock in the company.

By 1972 the company growth had increased to the point where its principal owner, Turner, sought the services of an experienced marketing expert to supervise the company's expanding market. Up to that time Turner marketing was conducted by a single jobber.

The defendant Bierer's contact with Mr. Turner ended the search. The defendant was a 1948 graduate of the United States Military Academy who had participated in graduate courses in engineering and business administration programs during his seven years of active service, which ended in 1955. Upon entering the civilian sector, the defendant acquired extensive industrial and sales experience in nationwide business organizations outside the furniture industry. By 1970 Bierer sought to become involved in his own enterprise,—in his words—"make a break for New England."

The search led him to the Turner Company. On March 15, 1972, Thomas and Constance Turner executed an agreement which enabled the defendant Bierer to acquire 37½ shares with a contemporaneous option to purchase 37½ additional shares from the Turners. On the same day the defendant obtained a written irrevocable option from the plaintiff to acquire Jenni-

son's 25 shares in the event Bierer exercised his option with the Turners to purchase the remaining shares then held by Mr. and Mrs. Turner. Both the Turners and Jennison options were available to the defendant until January 1, 1980, a date highly significant to the present controversy.

Shortly after these transactions were completed, Mr. and Mrs. Turner departed for a vacation sojourn that extended over a period of several months. Turner's departure left the operation of the company entirely with Jennison and Bierer. At this time the plaintiff and the defendant were mutually dependent on each other. Bierer relied entirely on Jennison for production; Jennison relied entirely on Bierer for business policy and marketing.

With Turner's return to the scene, in late 1972, problems surfaced. The company had limited cash resources. The situation was aggravated by tax liability asserted by the Internal Revenue Service that was adjusted by a substantial compromise cash payment.

Turner was continued as an employee of the company. As a director of the company, he received a substantial bonus. This further drained the company's cash position. More importantly, the building where the company plant was operated was not owned by the corporation. It was entirely owned by Turner and leased to the company. On January 15, 1973, Turner gave notice that the lease would be negotiated at an increased rental. When negotiations with the lessor were unavailing, Jennison and Bierer joined in exploring for a change in the location of the plant on more favorable terms. By this time the company payroll had increased to 35 employees; all were anxious to remain in the Bellows Falls area.

The search for a new location led to the acquisition of the site at the abandoned paper mill formerly used by the Moore & Thompson Paper Company on the Vermont bank of the Connecticut River. This property was highly suitable for the Turner operation. The property is served by a dominant easement in the land which provided valuable electric power rights for enjoyment by the owner of the premises if the mill property was used for manufacturing.

At this point in time, Bierer and Turner were equal stockholders. The corporate balance of power resided in the plaintiff Jennison. The defendant Bierer testified that he and Jennison had to join forces to meet the Turner problem. First and foremost was the need to acquire the Moore-Thompson plant site. To accomplish this objective, Jennison and Bierer formed a partnership which was authorized to do business under the laws of Vermont as the J & B Company. On December 13, 1973, the partnership acquired the site of the former Moore-Thompson paper mill from the Hudson Pulp and Paper Company for $66,000. The purchase price was financed by equal amounts of cash and the balance by notes executed by the partners Bierer and Jennison.

Removal to the new plant location was made in 1974. The negotiations for the acquisition of the new site were conducted principally by Bierer. The improvement of the site to afford trucking access, parking and the organization of the plant production, was done by Jennison's direction. The lease from Turner to the Turner Company then came to an end. The J & B Company leased the Moore-Thompson property to the Turner manufacturing enterprise and the company continued its operation at the new location.

Turner subsequently sold his remaining shares in the company to Bierer in 1977. This acquisition required a waiver on the part of Jennison of his right to sell his 25% interest in the company at the same price per share. Bierer paid Turner for the acquisition of the Turner shares in the Thomas Turner Company. This realignment established Bierer the majority stockholder, with 75% of the stock. Jennison continued as the minority owner of the remaining shares.

The Turner Company prospered with increased sales promoted by Bierer and in-

creased production under Jennison's direction. Despite the congenial relationship that attended Bierer's early participation in the company, no abiding friendship was generated. Indeed, feelings of tension developed. While Jennison ably discharged his responsibility in production and employee relations, Bierer competently handled marketing and sales. The ability of the participants to communicate with each other became impaired to the point where essential dealings took the form of written memoranda. Each was interested in what his counterpart was doing, but resorted to means other than oral communication to find out.

After Turner was removed from the company, the estrangement between Jennison and Bierer worsened. The business association of Jennison and Bierer was beset by restricted cash flow, low profit margin and the heavy debt of the corporation and the partnership. Bierer testified that he and Jennison cooperated because they realized they would "go down the drain if we didn't." Moreover, the partners had not had a normal conversation for more than two years. The situation was aggravated by the feeling of mutual dislike that prevailed between the partners' wives. Both Jennison and Bierer were eager to obtain a sale of the business and be relieved of their individual obligations on Turner notes. Despite this estrangement the partners were mutually dependent.

In this setting Bierer undertook to explore the possibilities of selling the Thomas Turner Company. The initial efforts failed for want of adequate financing on the part of the prospective buyers.

During the summer of 1978 the defendant Bierer was introduced to Norman Silberdick. Bierer expressed an interest in selling his plant and solicited Silberdick's assistance to accomplish that result. During 1978 Silberdick toured the Turner plant when no one was present. He informed Bierer that if he "was involved selling his business ... [Silberdick] would expect to be compensated at a rate of 5% of the total value of what transpired in terms of the business being sold."

At the time of this brokerage agreement Silberdick engaged an associate in his firm named Stewart W.A. Read, a 1978 graduate of Williams College. Read first engaged Silberdick as a business consultant. This connection ripened into a business partnership in the BSR Company. Silberdick's arrangement with Read was that he would pay Read $10 an hour for his work and 25% of any contingent fees generated.

In March, 1979, Read became interested in acquiring the Thomas Turner Company. Read had the financial resources to acquire both the Turner Company and J & B real estate interests. It was Read's earnest desire and intention to become involved in Vermont industrial enterprises. Although Read had substantial financing, he had a shortage in business experience.

In the negotiations which followed, Silberdick represented both Bierer, the seller, and Read, the prospective buyer. Several negotiating meetings were conducted at various places in the Bellows Falls area, including Silberdick's home and the Highland Restaurant. None of the negotiations were held at the Turner plant and the plaintiff Jennison did not participate or attend the meetings. Bierer informed Silberdick that he would handle all the negotiations and pass on to Jennison information essential to the sale. At one session Bierer acknowledged to Read that he "would have to talk to Jennison to put the deal over." Silberdick testified he was not interested in conferring with Jennison since Bierer was in control as the dominant stockholder. Bierer informed Silberdick that he would handle all negotiations in behalf of his minority shareholder and partner.

A final bargain between Bierer and Read was reached in April, 1979. The understanding was expressed in a memorandum prepared by Silberdick for submission to Read. Although Bierer was fully aware of the content of the document by having participated in all the negotiations, the memorandum was not made available to Jennison. Indeed, Jennison's interests in

the proposed acquisition are only briefly referred to, in connection with a future bonus pool and offer by the company to sell him the company automobile. This was in keeping with Silberdick's testimony that he was not particularly interested in Jennison's concern since he was only a minority stockholder.

The salient points of the Silberdick memorandum included:

Sale and purchase of 100% of stock in the Thomas Turner Company at $250,000;

Sale and purchase of the real estate at $250,000;

Bierer was to be employed by the Turner Company for a period of 12 years; two years on a full time basis at $30,000. For the remaining 10 years Bierer or his estate were to receive $30,000 for each year with annual payments personally guaranteed by Stewart Read. In the event Bierer worked after the initial 2 year period, his compensation would be in addition to the $30,000 annual payments. If Bierer remained as a consultant during the 10 year period, he was to be paid a further allowance of $100 a day plus travel expense and be available for phone consultations.

The Silberdick memorandum was submitted to Read; it was withheld from the plaintiff Jennison. The writing made no reference to the Jennison-Bierer partnership. The plan continues:

The company has a $230,000 net worth and more importantly, leases real property of 100,000 square feet. The property included a 999 year contract from New England Power to provide 330 kilowatts of electricity each hour practically free. The real estate was appraised for Bierer at a value of $1 million including the electricity rights. The company has an option to buy the realty until 1984 for $250,000.

With energy costs an expensive fact of life, the ownership of the real property reflects a potentially great asset. With the business profitable, and growing nicely, the acquisition of Turner allows an investment in a relatively solid company, which is a major employer in Bellows Falls.

The purchase price results from several months of negotiation and is viewed as a reasonably fair deal as the price of the company equals book; the real estate at a realistic figure; and the kicker to Bierer out of the profits of the business. The present value of Bierer's agreement is $172,580 at a discount rate of 8%, which when viewed as an additional price to the realty values the property at $423,000.

Initial Memorandum on the Acquisition of Thomas Turner Company dated April, 1979 (Pltf.Ex. 117) pp. 3 and 4.

Following the meeting of Silberdick, Bierer and Read that accomplished the so-called compromise, stated in the memorandum above, Read and Bierer went directly to the office of Read's attorney, George Nostrand, Esq. Nostrand was instructed to prepare the necessary documents in accordance with the acquisition plan expressed in the Silberdick memorandum.

Despite the fact that Silberdick was the chief negotiator for both buyer and seller, he did not accompany the principals to Nostrand's office. His absence from the initial meeting with Nostrand is understandable in the light of Silberdick's testimony at the bench trial. Silberdick testified that he intentionally concealed from Nostrand the fact that he represented Read in the acquisition and was to receive a broker's fee from Read, in addition to a commission from the sellers.[1]

---

1. Silberdick received a fee of $12,000 from Read for his efforts in the acquisition of the company during the period from June, 1979 to the final closing in December, 1979. He received additional compensation from Bierer of $9,375 and $3,125 from Jennison for the sale of their respective shares of stock. Silberdick received $12,500 for sale of the real property and the appurtenance. As to this sale, Bierer and Jennison contributed equal amounts of $6,250. More than that, after the transfer of ownership of the Turner Company was accomplished, the company paid Silberdick $1,000 a month as a consultant until the company became insolvent early in

As reported earlier, Bierer and Jennison rarely communicated by the spoken word. Other than Bierer's indication to Jennison that he was trying to sell the business, his first communication of the arrangement he and Silberdick had negotiated with Read was made by way of a brief typed memorandum on the "Subject: Proposed Sale," dated April 26, 1979. In sum, the writing conveyed the following information:

| | |
|---|---|
| Sales price of buildings | $250,000 |
| Stock | $250,000 |

Jennison and Bierer were to be relieved of liability on notes which they had endorsed to the First Vermont Bank, the buyer to assume all liabilities on these undertakings. The employment of the partners was set forth to provide:

W.J.—Two (2) year employment contract includes current salary, current fringe benefits, .025% of Pretax end of year profits. Contract is with company and renegotiable at end of two year period.

E.B.—Consulting contract, not as employee of company and on proportionate basis, as negotiated.

This communication was followed by a second handwritten memorandum addressed to "Walter" and dated May 24, 1979, quoted below:

Subject: Special Project:

So far it looks like agreement possible on the following:

(1) Bldg—$250,000—assuming any approval comes up like ours did.

(2) Stock—$250,000—assuming any audit completed as in line.

(3) Notes due us will be paid seperately [sic].

(4) (2) yr. employment contracts for us both. I am asking for a consulting agreement in case I can't work with them after '81. No real obligation to stay after that. Salaries continue as is—we get 10% of pre tax profits. All other existing benefits remain as is.

(5) We get cars after depreciation to "O."

If we ever kept our shipments up, the next few months is the time to do it.

Up to this time, Bierer did not disclose to Jennison the name of the prospective purchaser. The first draft of the contract documents followed the substance of the memoranda. The draft included the provision for the employment of the partners by the Turner Company. The draft included a provision that each seller agreed not to engage or participate in any competitive business in the Turner Company's product within a radius of 150 miles from Bellows Falls and for a restrictive period of 10 years. The restrictive covenant provision originated with Nostrand.

Neither Jennison nor Bierer expressed any dissatisfaction with the draft of the proposed contract sale. Bierer told Jennison he would have to give Read two years of employment.[2] Jennison was not sure he wanted to work for Read more than two years. Bierer responded to the effect that if he couldn't work for Read after '81, he would ask for a consulting agreement. Bierer had already made it clear to Read that he would not accept the proposed contract of sale unless he received adequate compensation for the ensuing ten-year period after the two-year employment contract

1980. It was not until bankruptcy proceedings were instituted that Read's counsel learned of Silberdick's dual participation in his client's acquisition of the Thomas Turner Company.

Silberdick's testimony at the trial exposed an additional commission of $15,000 which he received from Bierer for negotiating the management services contract as a part of Read's acquisition of the Thomas Turner Company. This commission was based on 5% of the sum of the annual compensation to be paid to Bierer during the anticipated life of the management services, for a total of $300,000. Silberdick's gross

commissions totalled $67,000. Silberdick shared $10,000 of this amount with Read in line with the employment agreement between them, referred to earlier in the court's opinion.

2. The notion that the restrictive covenant against competing with his former employer would have indentured Bierer is more fiction than fact. Bierer's experience in management was derived from sources outside the woodworking industry. It appears to have been transferable to other fields.

ended. Bierer told Jennison he would discuss a consulting contract at the end of two years.

The *Management Service Contract* was first proposed in April, 1979. It was conceived and designed by Bierer and Silberdick to meet the Bierer objection to the restrictive covenant and secure his future annual compensation over the life of the restraint. The management service arrangement was drafted by Nostrand after extensive discussion with Silberdick and Read. At no time during the drafting of the contract documents was disclosure made to Read's attorney, Mr. Nostrand, that Silberdick was to be paid by Read. At no time prior to July 1st did Nostrand have any discussion with the plaintiff Jennison.

The instruments drafted by Nostrand and submitted to Bierer and Jennison consisted of the options given by Jennison and Bierer for the purchase of all the Turner stock for $250,000, an option by Jennison and Bierer, doing business as the J & B Company, for sale of all the land and premises, including electric power rights and assignment of the leasehold interest in the Turner property, and the contracts for sale of the property and stock that was the subject of the options. Mr. Nostrand also prepared the Management Service Contract. The fact that Read and Bierer were to be involved in this undertaking was not disclosed to Jennison. The draft was provided only to Bierer and his advisors.

About two weeks before the date scheduled for the signing of the options and contract for sale, July 18, 1979, the latest draft of the documents for Read's acquisition of the Turner Company was submitted by Nostrand to Bierer and Jennison. Jennison submitted the drafts to Albert Bolles, Esquire, an attorney in Bellows Falls. Bolles' office was in the same building as that of Read's attorney. Bolles called Nostrand to inform him that Jennison had consulted him concerning the contract documents. Bolles made a few minor suggestions. He was principally concerned with the restrictive covenant that might restrict Jennison from working in northeastern Vermont, where Jennison hoped to retire. A reduction in the radius of the restrictive covenant from 150 to 100 miles from Bellows Falls was adopted by Nostrand and included in the final contract. Bolles informed Jennison that all the requested changes were adopted.

Neither Jennison nor his attorney, Mr. Bolles, was informed that a management service contract between Read and Bierer had been negotiated. The draft of this instrument was withheld from Mr. Bolles and his client. This concealment was done despite the fact that Nostrand had told Bierer on several occasions that he should discuss his employment arrangement with Jennison.

During the weekend of July 7–8, 1979, Colonel Bierer called Norman Sturtz, Esquire, of Livingston, New Jersey. Mr. Sturtz was a long time acquaintance with whom he had previously taken counsel. Bierer called Sturtz to inform him that the Turner acquisition was negotiated and ready for closing. A meeting was arranged at the Sturtz summer home in Monterey, Massachusetts.

Sturtz inquired of Colonel Bierer why there was no reference to Jennison in the Management Service Contract. Bierer replied that Jennison had a lawyer, although Bierer was not represented by a Vermont attorney. He indicated Jennison would make his own employment agreement with the buyer. He explained he was not aware of Jennison's deal "because he and I are not that friendly about it." Sturtz testified, by way of deposition, that Bierer went on to further explain:

And as a matter of fact, if I tell him [Jennison] anything with respect to this transaction as to what he should do, he will hold it against me because that's the relationship we had. And by the same token, I have given him information as to what I am doing, and he didn't want to be bothered with what I am doing. And as far as I am concerned, we are traveling our own record down the road. I am satisfied to negotiate my deal and he will negotiate his deal.

Mr. Sturtz was given to understand that both Bierer and Jennison were independently negotiating with Read's lawyer. Sturtz advised that the contract instruments should make it clear that Bierer and Jennison each independently had the right at any time to enter into any employment, consultant or advisory relationship with the optionee (Read) or his company. Sturtz then drafted, in longhand for insertion in the option agreements, a clause to this effect. When Mr. Sturtz was asked if he had any discussion with Bierer concerning whether he represented Jennison in any of the negotiations, the witness responded "It was absolutely clear to me that he was not."

The evidence is uncontradicted that the negotiations for the sale of the Turner Company were conducted entirely by Bierer and Silberdick. Bierer was concerned that any involvement by his partner Jennison might frustrate the sale. At the outset, Bierer assured Silberdick that he would handle all negotiations in behalf of Jennison. Nostrand understood this; he urged Bierer to inform Jennison of the separate employment arrangement. The misunderstanding by Sturtz that Bierer had not represented Jennison was Bierer's failure to disclose all of the true facts to his New Jersey counsel.

Colonel Bierer returned to Vermont with the proposed contract agreements as supplemented by the draft of the clause as New Jersey counsel recommended. Sturtz anticipated from his discussions with his client that Bierer would arrange to have the handwritten change incorporated in the contract. He further expected that the redrafted papers would be delivered "to the attorney for Mr. Jennison" with whom Mr. Bierer had indicated that Mr. Read's attorney was dealing. The next communication Mr. Sturtz received was a telephone call that the revised papers had been signed.

The time appointed for signing of the various documents was eleven o'clock the morning of July 18, 1979. Prior to the closing plaintiff's attorney informed Nostrand that the latest drafts were satisfactory to Jennison. After Nostrand was notified of the clearance, and shortly before the hour appointed for the closing, the defendant hand delivered typed notes of further changes he wished to have included. One of the last minute amendments was that recommended in the longhand draft by Sturtz. The provision was incorporated in paragraph 10 of the Contract of Sale. Under the heading of Employment Contracts, it is provided that Bierer and Jennison, as the sellers,

> agree with each other, and with the BUYER, that each SELLER, independently and without any responsibility to each other, has at any time the right to negotiate for or enter into any employment, consulting, advisory or other relationship with the BUYER or the COMPANY for any period beyond the two (2) year term - - -

specified for the employment of both Bierer and Jennison in the new company.

The signing took place as scheduled in Nostrand's office. Present were Bierer, Jennison, Read, Silberdick and Nostrand; Jennison's attorney, Mr. Bolles, was absent. Jennison and Bierer signed the options for sale of the real property, the Turner stock and the Contracts of Sale. As soon as these papers were executed, Bierer, Jennison and Silberdick departed from Nostrand's office and proceeded to the vicinity of the Aberdeen Hotel in the village square. At that location Silberdick and Bierer explained to Jennison that Silberdick was entitled to a commission. Silberdick then produced agreements to accomplish this result which had been prepared on July 17, 1979. These agreements provided for the commission paid to Silberdick by Bierer and Jennison, reported in the margin above. This was the occasion of Jennison's first meeting with Silberdick. After signing, Jennison returned to his work at the Turner plant.

Bierer and Silberdick returned to Nostrand's office, where Read awaited to accomplish the signing of the Management Agreement. A crucial provision in this doc-

ument was expressed in the ninth paragraph:

SECURITY FOR PERFORMANCE BY THE COMPANY. The COMPANY agrees to provide BIERER at the commencement of the term of employment (December 1, 1979) with an acceptable unrestricted twelve (12) year irrevocable bank letter of credit, guaranteeing for the full term of the employment period and consultive period payment by the COMPANY of all compensation of BIERER so as to assure BIERER that regardless of whether the COMPANY continues in existence, is merged, consolidated, dissolved and/or liquidated, that his full compensation as provided in this agreement will be paid over the twelve (12) year period contained herein.

The agreements signed on July 18, 1979 contemplated the exercise of the options by Read or his assignee by October 18, 1979. Title to all real and personal property, including the sale of the Turner stock, was transferred December 7, 1979.

Stewart W.A. Read exercised the options previously granted by Jennison and Bierer on October 5, 1979, as provided in the agreements. On December 7, 1979, the Read interests took title to all the property owned by Bierer and Jennison to complete the transfer of the Thomas Turner Company to the Read interests. Bierer and Jennison signed a new covenant not to compete with the Thomas Turner Company as provided in the Contract of Sale.

During the intervening time, through the efforts of Silberdick and Ira Marcus, an attorney associated with Bierer's New Jersey attorney Roland Sturtz, a letter of credit was issued by the First National Bank of Boston on December 7, 1979. The letter of credit was irrevocable. It was written in the amount of $226,914.74 for the benefit of Eugene Bierer for the account of the Thomas Turner Company. The security documents included an acceleration provision in the event of Turner Company's default in the payments to Bierer or bankruptcy.

Later in the day on December 7, 1979, and without Jennison's knowledge, Bierer and the Turner Company executed an Employment Contract with a different covenant not to compete. It was written according to the preceding Management Service Contract signed on July 18, 1979. As shown in the margin below, it obligated the company to pay the defendant $360,000 during the period December 7, 1979 through December 6, 1991. Bierer and Jennison continued in the employ of the Turner Company. Jennison was elected to the board of directors in June, 1980, and served in that capacity until March, 1981. During this time Jennison understood he and Bierer were working under the employment agreement as written in the Contract of Sale signed on July 18, 1979.

The letter of credit was devised to guarantee payments of future compensation to Bierer or his estate. It was secured by the company's pledge of substantial accounts receivable and inventory. When Read declined to advance much needed additional working capital the Turner enterprise collapsed. The letter of credit combined with management deficiencies to become the prime cause of the company's financial distress.

On March 10, 1981, the company filed a petition for bankruptcy. This event triggered the acceleration of payments due under the letter of credit. On March 26, 1981, the First National Bank of Boston issued its draft to Bierer in the amount of $215,429.16. Release from the restrictive covenant enabled Bierer and Jennison to seek and obtain employment elsewhere in the woodworking industry.[3]

---

**3.** The Employment Contract, executed on December 7, 1979 by Stewart W.A. Read for the Thomas Turner Company, Inc. and Eugene S. Bierer, and witnessed by Norman Silberdick and George Nostrand, includes the following provisions:

1. DUTIES DURING EMPLOYMENT PERIOD. The COMPANY hereby employs BIERER, and BIERER shall serve the COMPANY during the period, hereinafter called the EMPLOYMENT PERIOD, of two (2) years beginning December 1, 1979 and ending November

The fabric of the proof clearly demonstrates that the arrangement for Bierer's employment, as finally spelled out in the Employment Contract signed by Bierer and Read, was an intergral part of the consideration paid for the Turner acquisition. Although the advantage it provided to the defendant was concealed from the plaintiff, Bierer testified that once the restrictive covenant was "put on him" he would not have accepted the final agreement without the consulting agreement.[4] In the turn of

30, 1981 in an executive capacity similar to that in which he is presently employed by the COMPANY, with such duties as may reasonably be assigned to him from time to time by the Board of Directors of the COMPANY. During the EMPLOYMENT PERIOD, BIERER will devote his entire time and attention exclusively to the business of the COMPANY, except during usual vacation periods.

2. COMPENSATION DURING EMPLOYMENT PERIOD. The COMPANY shall pay to BIERER and BIERER shall accept from the COMPANY for his services during the EMPLOYMENT PERIOD gross compensation of Thirty Thousand Dollars ($30,000.00) per annum payable monthly. In addition, the COMPANY agrees for each year of the EMPLOYMENT PERIOD and for the one-year period immediately following the EMPLOYMENT PERIOD, BIERER shall be entitled to receive, in addition to his gross compensation, Seven and Five-Tenths Percent (7.5%) of the pre-tax profits of the COMPANY....

3. DUTIES DURING THE CONSULTIVE PERIOD. The COMPANY hereby retain BIERER to perform, and BIERER shall perform, during the period, hereinafter called the CONSULTIVE PERIOD, beginning on December 1, 1981 and ending November 30, 1991, such advisory and consultive services on a part-time basis as may, from time to time, be requested by the Board of Directors of the COMPANY....

  *  *  *  *  *  *

4. COMPENSATION DURING CONSULTIVE PERIOD. The COMPANY shall pay to BIERER and BIERER shall accept from the COMPANY for his services during the consultive period, compensation at the rate of Thirty Thousand Dollars ($30,000.00) per annum which shall be payable in equal monthly installments at the end of each month during such period.

5. RESTRICTIVE COVENANTS. BIERER agrees that during the EMPLOYMENT PERIOD and until November 30, 1991, he will not, unless acting as an officer or employee of the COMPANY or with the COMPANY's prior written consent, directly or indirectly own, manage, operate or control or participate in

events which followed, the consulting agreement resulted in an unearned windfall to the defendant alone.

## CONCLUSIONS

The rules of law which follow from the facts in this controversy are written in Chief Judge Cardozo's classic opinion in *Meinhard v. Salmon*, 249 N.Y. 458, 164 N.E. 545 (1928).

A trustee is held to something stricter than the morals of the market place.

or be connected as an officer, employee, partner or otherwise with any business connected with any of the products of the COMPANY and that he will not in any manner directly or indirectly compete with or become interested in any competitor of the COMPANY....

  *  *  *  *  *  *

9. SECURITY FOR PERFORMANCE BY THE COMPANY.

a. All unpaid compensation of Thirty Thousand Dollars ($30,000.00) due or to become due during the CONSULTING PERIOD shall immediately become due and payable at the election of BIERER upon the occurrence of an Event of Default. An Event of Default shall be any of the following:

(i) The COMPANY fails to make any payment pursuant to this Agreement when due and such nonpayment continues for ten (10) days after written notice of such nonpayment from BIERER to the COMPANY....

  *  *  *  *  *  *

(iv) A petition in bankruptcy, or complaint in insolvency, or for an arrangement or reorganization or other relief is filed by or against the COMPANY, under any bankruptcy or insolvency act, and such petition or complaint is not dismissed within Sixty (60) days of its filing.

b. (i) As security for the payment by the COMPANY of BIERER's gross compensation of Thirty Thousand Dollars ($30,000.00) per year during the CONSULTING PERIOD, the COMPANY is providing BIERER with an unrestricted Twelve (12) year irrevocable letter of credit....

4. Bierer testified his agreement not to compete was in his view valued at $300,000.00. In his Memorandum to Read in April 1979, urging him to acquire the Turner enterprise, Silberdick wrote: "The present value of Bierer's agreement is $172,580 at a discount of 8%, which when viewed as an additional price to the realty values the property at $423,000" (Plaintiff's Exhibit 117). As noted in the margin above, part of Silberdick's commission from Bierer was predicated on Bierer's management services agreement.

Not honesty alone, but the punctilio of an honor the most sensitive is then the standard of behavior.

164 N.E. at 546. *See also, Woods v. City National Bank & Trust Co.,* 312 U.S. 262, 269, 61 S.Ct. 493, 497, 85 L.Ed. 820 (1941). The concept is part of the Uniform Partnership Law, adopted by the Vermont General Assembly, 1941, No. 146 (11 V.S.A. §§ 1241–1246).

The trust relationship that governs that standard of behavior between Bierer and Jennison had its beginning at the time of Thomas Turner's withdrawal from active management of the company in 1972. Mr. Turner entrusted the affairs of the enterprise to the plaintiff, his superintendent and to Colonel Bierer, his recently acquired equal shareholder. Although clothed in corporate garb, in essence the operation was the joint enterprise of two stockholders with equal equity ownership by Bierer and Turner, with the balance of voting power in the hands of the minority stockholder, Jennison. In this alignment of corporate authority, each of the actors in the enterprise owed obligations of good faith, honesty and fair dealing to his business associates in the handling of the company's business.

Whether Bierer and Jennison trenched on these precepts by "joining forces to meet the Turner problem" that developed in the plant lease arrangement is of no concern in this litigation. It is enough to say that the episode should have warned the participants of danger ahead in the affairs of the Turner Company.

Be that as it may, the keystone to the trust relationship between the parties to this action derives from the formation of the partnership known as the J & B Company and the acquisition of the former plant of the Moore-Thompson Paper Company on December 13, 1973.

■ It is, of course, the firmly settled law of Vermont and elsewhere that the inception of a partnership established a relationship between the partners that is highly fiduciary. *Bradley v. Marshall,* 129 Vt. 635, 641, 285 A.2d 745 (1971); *Lyon v.*

*Prescott,* 103 Vt. 442, 446, 156 A. 679 (1931) (Powers, C.J.). The fiduciary character of the relationship continues until the partnership affairs are fully settled. Until that day each partner stands as a trustee in his dealings with partnership interests. His co-partners are the beneficiaries of the trust that is imposed on his dealings with partnership property. *Id.*

Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties.

*Meinhard v. Salmon, supra,* 164 N.E. at 546.

The defendant urges that he was released from any fiduciary ties that restrained his dealings with the J & B partnership property by force of an inclusion in paragraph 10 of the purchase agreement signed July 18, 1979. This clause was obviously designed to achieve this end.

The strength of the defendant's argument is undermined by the underlying facts. The draft was prepared by the defendant's counsel, Mr. Sturtz, when called upon to review the contract papers in Massachusetts shortly before the appointed time for signing. The draft was written by Sturtz with the mistaken belief that both Bierer and Jennison were separately negotiating their own employment arrangements,—that Jennison didn't want to be bothered with what Bierer was doing,—that each partner was making his own road to future employment.

In truth, Bierer and Silberdick excluded Jennison from all of the negotiating in the Read acquisition for fear he would spoil the bargain. Indeed, Silberdick testified that at the outset of his involvement, Mr. Bierer informed him that he (Bierer) would handle all negotiations and pass on all necessary information to Jennison. The negotiations followed this pattern, except there was no transmittal of the Bierer employment deal. Even the identity of the purchaser was kept from Jennison until shortly before July 18th.

Jennison's attorney, Albert Bolles, was not consulted until the proposed final drafts were delivered. At that point in time the Sturtz protective clause was not written. And there is no suggestion in the evidence that Mr. Bolles had the opportunity to review paragraph 10 before the signing, since he did not attend the signing and Bierer did not deliver his typed notes on the subject to Nostrand until shortly before the hour of closing.

■ The general rule, that failure to read or have a contract read to a party before signing it precludes the signer from complaining about the contents, does not apply where deception or artifice attend the transaction. *See, Cox v. Pabst Brewing Co.*, 128 F.2d 468, 470 (10th Cir.1942); 3 A. Corbin, *Corbin on Contracts*, § 607 p. 666.

■ Perhaps the plaintiff should have been more watchful. Yet he had no reason to suspect that the contract had been changed after his attorney had reported to Read's counsel that the instrument was satisfactory and cleared for signing.

The provision in the contract of sale which purports to give Bierer the liberty to make an independent employment arrangement with Read, or the new Turner Company, was induced by a lack of candor. The effort to free Bierer from liability to Jennison or Read was clothed in deception.

It is provided in the statutory law of Vermont by 11 V.S.A. § 1244 under the heading in bold type:

Partner as fiduciary

(a) Every partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by him without the consent of the other partners from any transaction connected with the information, conduct, or liquidation of the partnership or from any use by him of its property.

The section which follows provides the remedy for the breach of the trust imposed by virtue of the preceding section.

§ 1245. Right to an account

Any partner shall have the right to a formal account as to partnership affairs:

(1) If he is wrongfully excluded from the partnership business or possession of its property by his copartners;

(2) If the right exists under the terms of any agreement;

(3) As provided by the preceding section;

(4) Whenever other circumstances render it just and reasonable.

The statute establishes the right and provides the remedy. *Bradley v. Marshall, supra*, 129 Vt. at 641, 285 A.2d 745. The plaintiff was wrongfully deprived of the opportunity to seek a more favorable employment agreement than the undertaking which Bierer testified he alone negotiated in Jennison's behalf. Bierer's fault is that he purposely excluded his partner and business associate from the opportunity that he concealed to his own advantage.

The price of its denial is an extension of the trust at the option and for the benefit of the one he excluded.... No answer is it to say that the chance would have been of little value even if seasonably offered.

*Meinhard v. Salmon, supra*, 164 N.E. at 547.

To track the language and the teaching of *Meinhard* further:

The very fact that [Bierer] was in control with exclusive power of direction charged him the more obviously with the duty of disclosure, since only through disclosure could opportunity be equalized.

*Id.*

The evidence is undisputed that Jennison's interest as a stockholder in the Turner Company and his half interest as an equal partner in the J & B Company combined to constitute an equity of 37.5 percent in the proceeds from the sale of the Turner stock and the real property owned by the partnership. Bierer's equity was 62.5 percent.[5]

---

**5.** The ratio is derived by computing the respective interests of the parties in the Turner stock

and the J & B Co. real property as established in

Applying this ratio to the proceeds of $215,429.16, which Bierer derived from the letter of credit issued by the First National Bank of Boston, establishes Jennison's entitlement to $80,785.94 with interest from March 27, 1981. The court holds the defendant Eugene S. Bierer is liable to Walter G. Jennison in the amount of $116,-641.62.

It is SO ORDERED.

the contract of sale of July 18, 1979 excluding debts assumed by purchaser.

| Jennison | | | |
|---|---|---|---|
| | Turner Stock | 25% of $250,000 | $ 62,500 |
| | J & B Co. | 50% of 250,000 | 125,000 |
| | | | $187,500 |
| | percent of combined sale price = 37.5% | | |

| Bierer | | | |
|---|---|---|---|
| | Turner Stock | 75% of $250,000 | $187,500 |
| | J & B Co. | 50% of 250,000 | 125,000 |
| | | | $312,000 |
| | percent of combined sale price = 62.5% | | |